UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| TEAMSTERS LOCAL UNION NO. 597, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 2:26-cv-281 |
| ST. ALBANS CREAMERY, LLC, DAIRY FARMERS OF AMERICA, INC., | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff Teamsters Local Union No. 597 ("Plaintiff") brings this action seeking declaratory and injunctive relief against Defendants St. Albans Creamery, LLC and Dairy Farmers of America, Inc. ("Defendants"). Defendants recently closed the St. Albans Creamery, where members of the Plaintiff union were employed. Plaintiff claims the closure violated its members' Collective Bargaining Agreements ("CBAs"), and the parties are headed to arbitration on that issue. The date for arbitration has not yet been established.

Defendants have announced that they intend to cease employer contributions to employee health care premiums effective October 1, 2026. Plaintiff now moves the Court for a temporary restraining order and preliminary injunction requiring Defendants to continue paying the employer contributions, and to

cooperate in scheduling arbitration for no later than November 30, 2026. For reasons set forth below, Plaintiff's motion is **granted in part and denied in part.**

**Factual Background**

Plaintiff is a labor organization that represents employees at St. Albans Creamery. St. Albans Creamery is a wholly owned, controlled, and operated subsidiary of Defendant Dairy Farmers of America. The employees are represented by Plaintiff for collective bargaining purposes, and their employment is covered by a series of essentially identical CBAs. The current CBAs include a non-discrimination provision barring Defendants from discriminating against employees for union activity or membership. The CBAs also require binding arbitration for any alleged violations of the agreement.

On June 17, 2026, Defendants issued notice to Plaintiff that they intended to close the St. Albans facility, with the first phase of the closure to occur on August 17, 2026. In response, Plaintiff initiated a grievance under the CBAs, claiming that Defendants were retaliating against employees for holding a strike in the fall of 2025. Plaintiff also demanded both effects and decisional bargaining.[1] Plaintiff reports that

[1] "Effects bargaining" refers to negotiations regarding "the effect that the decision might have upon employees' terms and conditions of employment." *Local Union 36, IBEW v. NLRB*, 706

the parties have engaged in a few bargaining sessions over the effects of the decision, with no resolution to date, and that Defendants have refused to submit to any decisional bargaining.

Plaintiff claims to have evidence of anti-union animus that led to the announced closure, including statements by plant supervisors. Plaintiff is also allegedly in possession of an internal corporate memorandum ("Memo") dated October 7, 2025 – the date on which the parties ratified the latest CBAs – proposing "idling operations" at the St. Albans facility with the primary goal of "Union Decertification." On August 12, 2026, counsel for Defendants sent a letter to counsel for Plaintiff alleging that the Memo is fake and was created by artificial intelligence. Plaintiff disputes that assertion, and contends that even without the Memo it has sufficient evidence to raise a viable discrimination claim in arbitration.

In a prior motion for a temporary restraining order, filed August 14, 2026, Plaintiff claimed that Defendants had begun effectuating the closure. The plant had largely ceased processing milk, receiving deliveries, and ordering necessary supplies. Machinery was being dismantled and equipment was being prepared for shipment to other facilities. Plaintiff moved the

---

F.3d 73, 81 (2d Cir. 2013). "Decisional bargaining" refers to negotiations "over the decision itself." *Id.*

Court to issue an order requiring Defendants to halt the closure until the completion of the arbitration process.

The Court initially granted Plaintiff's motion for a temporary restraining order. Defendants subsequently informed the Court that the plant was effectively closed when the Court issued its order. Defendants further represented to the Court that they would take no action to dismantle or sell the plant, such that in the event an arbitrator ruled in favor of Plaintiff, the workers could return to their jobs. Plaintiff did not dispute that the plant had already effectively closed. The Court therefore vacated the temporary restraining order upon assurances from Defendants' counsel that the plant would remain intact, with the exception of removal of certain hazardous chemicals, and the parties would cooperate to schedule an expedited arbitration.

Plaintiff now reports that Defendants intend to stop paying the employer's share of employee health care premiums beginning October 1, 2026, for the 44 bargaining unit members covered by the employer plan. Under the CBAs, the employer was obligated to cover 85% of employees' health insurance premiums. Without those employer-sponsored benefits, employees will need to either continue their existing coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") or obtain new coverage. COBRA allows employees to continue their employer-

based coverage for a limited period of time after they are separated from employment, but they must pay both the employee and employer portions of the monthly premium. *See* 29 U.S.C. § 1161(a); *Local 217, Hotel & Restaurant Emp. Union v. MHM, Inc.*, 976 F.2d 805, 809 (2d Cir. 1992).

Plaintiff submits that its members and their families will be unable to afford health insurance under those circumstances. In support, Plaintiff has submitted declarations from 11 employees. The declarants attest to health issues they and/or their families are facing, and the hardships they will suffer without health insurance. For example, one employee takes a daily medication that currently costs him a $15 co-pay, but without insurance will cost $3,000 per month. He is anticipating blood clot surgery in October, has a son with asthma and vision problems, and his wife has long-term health issues that require ongoing medical treatment. The employee has been looking for work but has been unsuccessful. He states that he paid approximately $80 per week for health insurance while employed by Defendants. Without the employer contribution, he will not be able to afford other coverage. ECF No. 26-5.

A second declarant and her husband both worked at the St. Albans facility. While employed, her family paid $79.55 weekly for health insurance. Without employer coverage, the COBRA premiums for her family of six would be nearly $2,500 per month.

Her husband has a surgery scheduled for October 7, and takes medications that will cost $1,100 per month without insurance. She and her daughter have mental health conditions that require regular therapy. The family has spent its savings and is currently in debt. ECF No. 26-6.

A third declarant currently collects unemployment benefits of approximately $600 per week. While employed, she paid approximately $80 per week for health insurance. She believes her COBRA premium would be over $2,000 per month. This declarant suffers from hyperthyroidism and stage four endometriosis. She will need surgery for both conditions in the near future. She also takes medication that, without insurance, will cost almost $700 per month. ECF No. 26-7.

A fourth declarant's daughter has severe dental issues that require frequent visits to the dentist. The daughter has several tooth extractions scheduled in the coming months and will require antibiotics. The declarant herself takes daily medication for high blood pressure and drug addiction. She currently pays only a few dollars a month for medications. Without insurance, she will be unable to afford medications for her family. She has been unable to find work and has no savings. ECF No. 26-8.

The remaining declarations are similar with respect to pressing health issues and the need for continued employer contributions to insurance premiums.

Defendants oppose Plaintiff's motion, arguing in part that the relief sought is overly broad. Defendants note that some former employees have found other work that includes insurance coverage. Defendants also cite the Court's previous suggestion that relief based on a lack of health insurance should be based on individual assessments of irreparable harm. In a related argument, Defendants submit that monetary questions, such as continued employer sponsorship of health insurance for the entire bargaining unit, must be resolved by the arbitrator.

With respect to employees who have found other work, the declarations submitted by Plaintiff show that those employees may not have immediate access to alternative health insurance coverage. One declarant states that although he has been hired to work at the Keurig Dr. Pepper plant in Essex, Vermont, he expects to start work "in the next few weeks" and believes that health coverage under his new employer will not commence until he has worked 90 days. ECF No. 26-11 at 3. Another declarant states that he has found a job with RL Vallee, Inc., but his new employer only provides health insurance for full-time employees, it is not clear whether he will be working full-time, and he believes it takes "a few weeks to become eligible for the

insurance." ECF No. 26-13 at 2. A third declarant states that he has found a new job but has not yet started work there. ECF No. 26-10 at 2.

Defendants also oppose Plaintiff's request for arbitration on or before November 30, 2026. Plaintiff reports that it has recommended several possible arbitrators since August 26. Defendants recommended two, and rejected each of Plaintiff's recommendations except for Arbitrator Sarah Garraty. Arbitrator Garraty has informed the parties that she is not available until January 2027, and for a remote hearing only. Defendants have reportedly agreed to leave the St. Albans facility intact until February or March 2027 to allow time for Arbitrator Garraty's decision.

Plaintiff submits that Defendants' counsel previously agreed to expedited arbitration, and that a hearing in January does not qualify as "expedited." Plaintiff therefore moves the Court to order Defendants to make all reasonable efforts to schedule an in-person arbitration hearing before a mutually acceptable arbitrator as soon as possible, but in no event later than November 30, 2026.

## Discussion

### I. Availability of Injunctive Relief

A district court's ability to grant injunctive relief in the context of a labor dispute is limited. The Norris-LaGuardia

Act, 29 U.S.C. § 101 *et seq.*, "deprives federal courts of the jurisdiction to grant injunctive relief in labor disputes, except in limited circumstances." *Niagara Hooker Emps. Union v. Occidental Chem. Corp.*, 935 F.2d 1370, 1375 (2d Cir. 1991) (citing 29 U.S.C. § 101). One limited exception traces to *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970), which allowed a temporary restraining order preventing a union from striking in violation of a no-strike provision in a collective bargaining agreement. *Id.* at 254. The Second Circuit has extended *Boys Markets* to the inverse scenario, known as a "reverse *Boys Markets*" order, allowing "unions to obtain injunctions against employers to preserve the status quo pending arbitration of a labor dispute as long as (1) the underlying dispute is subject to mandatory arbitration; and (2) the injunction is necessary to prevent the arbitration process from becoming a 'hollow formality' or 'meaningless ritual.'" *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*, 230 F.3d 569, 581 (2d Cir. 2000) (citing *Niagara Hooker*, 935 F.2d at 1377).

## II. Continued Health Care Benefits

### A. "Reverse *Boys Markets*" Requirements

The first issue for the Court's consideration is Plaintiff's entitlement to "reverse *Boys Markets*" relief with respect to Defendants' stated intention to cease contributions

to employee health benefit plans. There is no dispute that the underlying issue in this case is subject to mandatory arbitration. The CBAs bar discrimination based on union-related activity or membership, and further provide that grievances related to a CBA violation must be resolved in binding arbitration. The first prong is therefore satisfied.

With respect to the "hollow formality" or "meaningless ritual" prong, *Niagara Hooker* held that the arbitration process is "rendered meaningless only if any arbitral award in favor would substantially fail to undo the harm occasioned by the lack of a status quo injunction." 935 F.2d at 1378. Plaintiff contends that stopping the employer's contribution to health benefits, or even the threat of such action, will cause its members irreparable harm — in the form of untreated medical conditions and/or related emotional distress — that cannot be cured by an arbitrator. Plaintiff's position is consistent with the well-established definition of irreparable harm as "harm shown to be non-compensable in terms of money damages." *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113–14 (2d Cir. 2003).

The Second Circuit has held that a threat to terminate medical coverage for workers can constitute irreparable harm. *See Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir. 1979) ("the threatened termination of benefits such as medical coverage for

workers and their families obviously raised the spectre of irreparable injury"); *see also Commc'ns Workers of Am., Dist. One, AFL-CIO v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir. 1990) (citing *Whelan*, 602 F.2d at 1062). In *Whelan*, employer trustees of a union health fund stopped payment of medical benefits to striking workers. 602 F.2d at 1060. The district court found that the cessation of benefits constituted irreparable harm, issued an injunction, and the Second Circuit affirmed. *Id.* at 1062. In *Kelly v. Honeywell International, Inc.*, 933 F.3d 173, 184, 186 (2d Cir. 2019), the Second Circuit cited *Whelan* as support for affirming a preliminary injunction barring the employer from terminating medical benefits of retirees.

Other circuit courts have issued similar rulings. In *United Steelworkers of America, AFL-CIO v. Fort Pitt Steel Casting, Division of Conval-Penn, Division of Conval Corp.*, the employer stopped making contributions to its health insurance plan during a worker strike. 598 F.2d 1273, 1276 (3d Cir. 1979). The district court ordered the employer to continue payments, and the Third Circuit affirmed, concluding that "surely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute substantial and irreparable injury." *Id.* at 1280 (internal quotation marks omitted). In *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987), an opinion written by future Supreme

Court Justice Stephen Breyer, the court addressed the termination of employer-supported health benefits for retirees. The court considered:

> general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm; such general facts as (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life.

*Textron*, 836 F.2d at 8. The court accepted an affidavit from a union official stating that three retirees had suffered a reduction in medical care as a result of the termination of benefits, and affirmed the district court's finding of general irreparable harm. *Id.* at 8-9. The court also noted that without such benefits, "workers would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities." *Id.* at 8.

Defendants ask the Court to distinguish *Textron* and *Kelly* because, in those cases, the plaintiffs were retirees on fixed incomes who could not return to work. Here, several declarants attest that they are currently searching for or have obtained new employment. Defendants also urge the Court to distinguish *Whelan*, since *Whelan* was decided pre-COBRA and the striking

workers in that case had no alternative source of health insurance.

Although the *Whelan* decision issued prior to advent of COBRA benefits, its holding still governs this case. Indeed, courts within this Circuit have regularly cited *Whelan* post-COBRA. *See, e.g., LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004); *NYNEX Corp.*, 898 F.2d at 891; *Loc. 217 Hotel & Rest. Emps. Union v. MHM, Inc.*, 805 F. Supp. 93, 105 (D. Conn. 1991), *aff'd*, 976 F.2d 805 (2d Cir. 1992). Moreover, the declarants make clear that COBRA benefits are largely unaffordable, as employees would need to cover their own portion of the premium plus the 85% that was previously covered by the employer. Defendants' assertion that COBRA benefits are available within a period of 60 days, and do not require payment until 45 days thereafter, *see* 29 U.S.C. § 1162(3), thus offers little relief for such employees.

Defendants argue that the cost of health insurance is a monetary issue that can be addressed in arbitration. Plaintiff's declarants bely that contention. Employees attest that they cannot afford health insurance premiums without employer contributions. Failure to secure health insurance will result in missed appointments, medications, and necessary surgeries. Plaintiff contends that Defendants have violated the CBAs, and if the arbitrator agrees, employees will be entitled

to back pay and other benefits. However, any emotional and physical harm suffered prior to the arbitrator's decision will be irreparable, and therefore will not have been merely a monetary issue.

The Court finds that Plaintiff has shown the type of harm that cannot be cured by an arbitrator's decision. If employees cannot afford health care without the employer's support, and are correspondingly unable to receive necessary medical treatments or medications, the resulting impacts on health will constitute irreparable harm. *See Loc. 217 Hotel & Rest. Emps. Union*, 805 F. Supp. at 105 (holding that "[t]here is little doubt that plaintiffs have satisfied" irreparable harm requirement where union representing hotel employees offered affidavits of two employees who were "foregoing medical care for want of health insurance"). The declarations submitted by Plaintiff, including those employees who have secured new employment but whose access to new coverage will be delayed, illustrate the hardships employees will suffer. For those employees, the emotional and physical harms resulting from a lack of insurance would be beyond the arbitrator's ability to remedy, thus rendering the arbitration a "hollow formality." *See Int'l Union v. Consol Energy, Inc.*, 243 F. Supp. 3d 755, 764 (S.D.W. Va. 2017) ("Termination of Plaintiffs' group health insurance benefits is likely to cause harm that cannot be

remedied by the arbitrator, threatening to make arbitration but a 'hollow formality.'"). Plaintiff has therefore satisfied the test for relief under *Boys Markets*.

**B. Traditional Equitable Requirements**

Having found that Plaintiff has cleared the initial hurdle for obtaining "reverse *Boys Markets*" relief, the Court turns to the traditional requirements for obtaining immediate injunctive relief. A temporary restraining order "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *see also Oeschger v. GeneThera, Inc.*, 395 F. Supp. 3d 345, 355 (D. Vt. 2019) (explaining that the same factors for considering a preliminary injunction apply to temporary restraining orders).

Irreparable harm occurs when "upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Gov't Emps. Ins. Co. v. Patel*, 166 F.4th 280, 291 (2d Cir. 2026) (citation omitted). In a case such as this, courts often "focus into a single concept the twin ideas of irreparable injury and frustration of arbitration." *Local*

*Lodge No. 1266 Int'l. Ass'n of Machinists and Aerospace Workers v. Panoramic Corp.*, 668 F.2d 276, 286 (7th Cir. 1981). For reasons set forth previously, the Court finds Plaintiff has satisfied its burden of showing that the cessation of employer-sponsored medical benefits will result in irreparable harm.

With respect to the likelihood of success on the merits, the Second Circuit has cautioned that "[c]ourts are not to delve into the substantive provisions of . . . a collective bargaining contract, since this would usurp the function of the arbitrator." *Niagara Hooker*, 935 F.2d at 1375. Consequently, Plaintiff only needs to show that its dispute under the CBAs "is sufficiently sound to prevent the arbitration from being a futile endeavor." *Panoramic*, 668 F.2d at 284-85; *see also Nursing Home & Hosp. Union No. 434 AFL-CIO-LDIU by Mackson v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1098 n.3 (3d Cir. 1985). Here, Plaintiff claims to be in possession of evidence, both spoken and written, to support its claim. While it is the arbitrator who will ultimately determine whether such evidence warrants relief, the Court is satisfied at this stage that Plaintiff will be presenting a non-futile claim.

Finally, Plaintiff cites the well-recognized public interest in enforcing contracts, *see* ECF No. 26-1 at 33 (citing *Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 81 (W.D.N.Y. 2018)), as well as public policy favoring collective

bargaining and arbitration of labor disputes, *see id.* at 34 (citing 29 U.S.C. § 151; *1199 SEIU United Healthcare Workers E. v. Chinese-American Planning Council Home Attendant Program*, 182 F.4th 67, 95 (2d Cir. 2026)). The Court finds that the equities of the case, the balance of hardships, and the public interest favor Plaintiff's position. *See Kelly*, 933 F.3d at 186 ("The equities tip decidedly in the Post-Expiration Plaintiffs' favor . . . ."). Plaintiff is therefore entitled to a preliminary injunction requiring Defendants to continue paying the employer portion of employee health care premiums.

Defendants contend that if the Court issues a preliminary injunction covering the entire bargaining unit, the order will be overly broad in part because some employees have secured new jobs and insurance coverage. The Court agrees that the question of irreparable harm will be rendered essentially moot if an employee is able to secure new coverage by means of a new employer. Accordingly, the Court grants the motion for a preliminary injunction, and Defendants shall continue to pay the employer portion of health insurance premiums through the conclusion of the arbitration process, with the narrow exception of any employee who secures alternative health insurance coverage through a new employer. For any such employee, Plaintiff shall inform Defendants that alternative health coverage has been secured, and Defendants may cease paying the

employer portion of that employee's coverage as of the date the employee's new insurance coverage becomes effective.

**C. Bond Requirement**

The Norris-LaGuardia Act provides that:

> No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107. The Act does not apply, however, when a party qualifies for a *Boys Markets* exception. *See Niagara Hooker*, 935 F.2d at 1376.[2] Federal Rule of Civil Procedure 65(c) allows the Court to consider "security in an amount proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of any bond is committed to the Court's discretion, and the Court may even "dispense with the bond requirement where there has been no proof of likelihood of harm." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (citation omitted).

Plaintiff requests that any bond amount be nominal. Plaintiff also notes that a bond is not contingent on the merits

[2] For this reason, the Court declines to consider Defendants' argument under 29 U.S.C. § 108.

or outcome of the arbitration. Indeed, "the outcome of the arbitration process does not, in and of itself, prove that the reverse *Boys Markets* injunction was wrongful." *Newspaper & Periodical Drivers' & Helpers' Union, Local 921 v. San Francisco Newspaper Agency*, 89 F.3d 629, 634 (9th Cir. 1996). Case law submitted by Plaintiff indicates that, in similar situations, district courts have required a bond in the amount of $10,000. *See, e.g.*, *Constellium Rolled Prods. Ravenswood, LLC v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, AFL-CIO/CLC, No. 2:18-CV-01404, 2018 WL 6329748, at *10 (S.D.W. Va. Dec. 4, 2018). A bond in that amount must be posted by October 15, 2026.

**III. Scheduling Arbitration**

Plaintiff also seeks an order requiring in-person arbitration no later than November 30, 2026. Defendants submit that they have negotiated the arbitration question in good faith, have secured an arbitrator, and as noted above, have agreed to leave the St. Albans plant intact until February or March 2027. Plaintiff contends that Defendants' counsel agreed to expedited arbitration, and that remote arbitration in January 2027 is not "expedited."

The scheduling of arbitration is not within the Court's control. The parties appear to have identified an acceptable arbitrator, and her schedule dictates the timing of the process.

The Court also notes that, as Plaintiff's counsel conceded at oral argument, granting the motion for a temporary restraining order and preliminary injunction moots any question of irreparable harm that might result from a January 2027 arbitration.

While Plaintiff submits that Defendants have made efforts to delay the arbitration, the evidence indicates that Defendants agreed to an arbitrator suggested by Plaintiff, and that it is the arbitrator who now controls the timing of that proceeding. Plaintiff's motion for an order requiring an earlier, in-person arbitration is denied.

## Conclusion

For the reasons set forth above, Plaintiff's motion for a temporary restraining order and preliminary injunction (ECF No. 26) is **granted in part and denied in part.** Defendants shall continue to pay the employer portion of health insurance premiums through the conclusion of the arbitration process, with the narrow exception of any employee who secures alternative health insurance coverage through a new employer. For any such employee, Plaintiff shall inform Defendants that alternative health coverage has been secured, and Defendants may cease paying the employer portion of that employee's coverage as of the date the employee's new insurance coverage becomes

effective. Plaintiff's request for an order requiring in-person arbitration no later than November 30, 2026 is denied.

DATED at Burlington, in the District of Vermont, this 28th day of September 2026.

/s/ William K. Sessions III
Hon. William K. Sessions III
U.S. District Court